**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

PICTOMETRY INTERNATIONAL
CORP.,

                Plaintiff,

     v.

AIR AMERICA FLIGHT CENTER LLC,

                Defendant.

**COMPLAINT**

Civil Action No. 6:18-cv-06487

### INTRODUCTION

Pictometry International Corp. ("Pictometry") alleges upon information and belief as follows against Defendant Air America Flight Center, LLC ("Air America"):

### NATURE OF THE ACTION

1.     This action arises in the midst of Defendant Air America's refusal to return Pictometry's imaging technology to Pictometry in violation of Pictometry's exclusive possessory rights to that equipment and the terms of a long-standing contract between the parties.

2.     Pictometry is a leader in the aerial imagery field, providing, among other things, 360 degree views and specialized mapping to its clients.

3.     Air America's business involves the operation of a flight center and the use of aircraft in support of, among other things, aerial imagery.

4.     For the past thirteen years, Air America has partnered with Pictometry to take aerial images from Air America's aircraft, using Pictometry's proprietary technology.

5.     Throughout that period, Pictometry supplied Air America with a range of aerial imaging equipment, including, most recently, the Pod (defined below), which is a revolutionary imaging technology licensed exclusively to Pictometry.

6.     Pictometry has also bestowed upon Air America a wealth of knowledge regarding how best to capture images using that proprietary technology and equipment.

7.     That relationship between Pictometry and Air America is now ending, and Air America is not taking the break-up well.

8.     When Pictometry requested that Air America return the Pod to Pictometry, Air America refused to do so, without any lawful basis.

9.     Since November 2017, Air America has made Pictometry an unwilling player in a game of whack-a-mole: Air America identifies a purported reason it cannot return the Pod;

Pictometry addresses Air America's stated concern; Air America then identifies a new purported reason it cannot return the Pod. The result is that Pictometry has met Air America's every whim, and yet it still does not have its Pod.

10. Air America's bad faith tactics have not been limited to withholding this equipment. For example, Air America has also:

(a) cancelled insurance coverage it was required to maintain under the contract between the parties;

(b) has not provided written statements confirming that Air America has not misused confidential Pictometry information as required under the contract; and

(c) has failed to respond to Pictometry's direct request that Air America confirm that it is not competing with Pictometry or assisting Pictometry's competitors in violation of the contract.

11. Pictometry's physical and intellectual property is in the hands of a party which consistently refuses to respect Pictometry's rights to that property. Court intervention is necessary to redress the substantial and irreparable harm Pictometry has, and continues to suffer, each day Air America's unlawful actions continue.

## PARTIES

12. Pictometry International Corporation is a corporation organized under the laws of Delaware with a principal place of business at 25 Methodist Hill Drive, Rochester, New York 14623.

13. Air America Flight Center, LLC is a limited liability company organized under the laws of Florida with a principal place of business at 1585 Aviation Center Parkway, Hanger 602, Daytona Beach, Florida 32114.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are diverse, and the amount in controversy exceeds $75,000.

15.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this district, and because Pictometry and Air America are parties to the Air Services Agreement dated September 15, 2015 (the "ASA"), which provides for jurisdiction and venue in this Court.  *See* Ex. A at ¶ 14e.

16.     A true and correct copy of the ASA is attached as Exhibit A.[1]

17.     This Court has personal jurisdiction over Air America because Air America consented in the ASA to the exclusive jurisdiction of any state or United States court in Monroe County, New York in any legal proceeding relating to the ASA, and because Air America's Authorized Member is located in New York.

## FACTUAL ALLEGATIONS

### *Pictometry's Innovative Technology*

18.     Pictometry is a leading provider of aerial imaging and mapping technology that uses three-dimensional photographs to view high-resolution images of land and property in their entirety.

19.     Pictometry has more than 40,000 customers in government and commercial sectors, including energy and insurance providers, public utilities, and construction companies.

20.     Specifically, Pictometry provides what are known as oblique and orthogonal aerial imagery.

21.     Oblique imagery is aerial imagery captured at an angle of 40-45 degrees, designed to provide a more natural perspective and make objects easier to recognize and interpret.  These images are captured from north, south, east and west directions to offer 360-degree views of

---

[1]     Capitalized terms used herein but not otherwise defined shall have their meaning set forth in the ASA.

properties. Those images are then geo-referenced (*i.e.*, linked to a specific geographic point), giving users the ability to interact with, measure, and extract data from the images.

22.    Orthogonal imagery, unlike oblique imagery, is aerial imagery that provides a true top-down view that can be aligned to a map grid. These images can then be integrated into geographic information systems so that users can understand the property, land features, local topography, and other information.

23.    These images can be combined with specialized mapping technology for wide-ranging uses for its customers. Pictometry's aerial imagery and data solutions products are, for instance, used by governmental authorities to aid in land-use planning, assessing public safety, and inspecting property. The technology is also used by energy companies to, for example, derive solar measurements from Pictometry's images, and manage pipeline assets and vegetation. This technology is also of vital importance to insurance providers in assessing insurance claims following catastrophic events like floods or hurricanes.

24.    Collectively, these services, described in paragraphs 18-23, are referred to herein as the "Pictometry Product."

### *Pictometry Partners with SpookFish*

25.    On May 17, 2016, Pictometry announced a partnership with SpookFish Limited ("SpookFish"), an Australian company focused on the development and commercialization of premium, next-generation, on-demand, geospatial imagery products and services.

26.    These products and services provide less expensive, higher-resolution images that can be associated with certain geographic points to enable customers to accurately assess land or property.

27.     As part of their partnership, SpookFish granted Pictometry an exclusive, long-term license to operate SpookFish Capture Platform technologies and sell output products in North America, in exchange for a royalty payment to SpookFish.

28.     This partnership is governed by the Development, License, and Royalty Agreement dated May 17, 2016 (the "SpookFish Agreement").

29.     Pursuant to the SpookFish Agreement, Pictometry is authorized to select an aircraft vendor to assist with the development of the SpookFish Capture Platform technologies in the United States.

30.     Pictometry selected Air America as the aircraft vendor for the SpookFish technology, and, at Pictometry's request, Air America procured and prepared an aircraft for use as the initial prototype in the United States in March 2017.

31.     Consistent with the ASA, Pictometry paid for all costs associated with modifications to the aircraft, research and development related to the Spookfish technology, and Pictometry also paid for the registration of the plane.

32.     Given the highly confidential, proprietary nature of the revolutionary SpookFish technology, including novel scanning mechanisms and highly specialized carbon fiber composite tubs used to position aerial imaging technology outside the aircraft, Pictometry is obligated under the SpookFish Agreement to protect SpookFish's information.

33.     Pictometry and SpookFish also collaborated extensively on the design and refinement of new technologies that improved the capability and performance of SpookFish technology.

34.     Pictometry employed its expertise in aerial imagery capture to meet the high quality imagery demands of the U.S. market.

35.     For example, Pictometry developed new sensor technology and resolution, camera optics, pilot interface, and ultra-high resolution image capture for the SpookFish technology.

36.     During program development and flight tests conducted in January 2017, Pictometry and SpookFish worked diligently together to calibrate flight test data, logging instrumentation used for recording aircraft speed, position, altitude, engine parameters, control forces and positions and aircraft orientation, all to improve the accuracy and efficacy of its imagery.

37.     In February 2017, Pictometry agreed to contribute $1.25 million to fund a major research and development project with SpookFish's international sensor supplier, which involved heavy customization of the sensor package used by SpookFish to further improve performance and reliability.

38.     The enhanced sensor package was designed to substantially improve productivity of Pictometry's ultra-high resolution program in North America, as well as to provide several significant performance and operational benefits.

39.     For example, customizations of the sensor package include upgrades allowing for ten times the amount of data throughput for transmission of high-quality images, enable integration with custom optic equipment, sensor cooling for high-altitude operation, and allow for longer focal length lenses that can increase magnification of objects.

40.     This technology is truly groundbreaking, and it affords Pictometry a significant competitive advantage.

41.     This technology also provides significant efficiencies compared to other aerial imaging equipment.

42.     SpookFish's sensors are more capable than competitors' sensors, and the technology permits simultaneous use of multiple sensors, which means that SpookFish camera equipment can provide more comprehensive three-dimensional models and higher-resolution photos than other providers, more quickly than other providers.

43.     With this equipment Pictometry can, for example, rapidly image an entire country or countries in high resolution at just a fraction of the cost of traditional aerial photography systems.

44.     In addition, with the emergence of new, lower-cost competitors, it has become more important now than ever for Pictometry to scale its business to maintain its position as a leader in aerial imagery and three-dimensional measurement software.

45.     The SpookFish technology is a key element of that expansion and, for that reason, Pictometry and SpookFish have continued to collaborate extensively on the design and refinement of new technologies that will improve its capability and performance, and work toward mass deployment of the technology.

### *Pictometry Retains Air America to Fly Planes Equipped with Pictometry Technology*

46.     While Pictometry develops its imaging technology and provides the resulting images and data to its clients, Pictometry's business does not extend to flying the aircraft from which these images are taken.

47.     Instead, Pictometry contracts with third-party vendors who own and/or operate aircraft to fly the planes on which Pictometry's technology is installed.   The Pictometry Technology then captures images, extracts data, and reports the data and images back to Pictometry for ultimate use by Pictometry's customers.  *See* Ex. A ¶ 6e.

48.     One such vendor Pictometry retained to fly its technology is Air America.

49.     Pictometry and Air America have maintained a business relationship for over thirteen years.

50.     During this time, their relationship has been governed by successive service contracts, the latest of which, and the one that is currently operative, was entered into on September 15, 2015—the ASA.

51.     Because Air America's planes are not built with Pictometry's technology pre-installed, highly-specialized technicians must configure Air America's airplanes and Pictometry imaging hardware onto Air America's aircraft.

52.     Because this information and know-how is a fundamental part of Pictometry's success, the parties agreed in the ASA that Air America is prohibited from competing with Pictometry or misusing or disclosing Pictometry's confidential information.  *See* Ex. A. ¶ 6a, 6e (providing that the Pictometry Technology is a "commercially valuable, proprietary product of Pictometry," which is "confidential and contains substantial trade secrets of Pictometry.").

53.     The ASA commenced on September 15, 2015 and continued for a two-year period (the "Initial Term").  *See* Ex. A ¶ 3a.

54.     The ASA automatically renews for successive additional one-year terms on the same terms and conditions (a "Renewal Term," and together with the Initial Term, the "Term"), and either party may terminate the ASA at least ninety days prior to the end of the current Term by providing notice to the other party.  *See id.*

55.     Under the ASA, Air America agreed to provide aircraft, upon which Pictometry's technology would be installed, and Air America also agreed to provide qualified pilots to operate the aircraft.  *See* Ex. A ¶ 1a.

56.    On information and belief, Air America has not been involved in the development of any imaging technology, including but not limited to the Pod, and the ASA affords Air America no right to do so.

57.    On information and belief, Air America has no ownership interest in any imaging technology, including but not limited to the Pod, and the ASA affords Air America no right to claim any such ownership interest.

58.    On March 22, 2017, one of the pieces of proprietary imaging equipment Pictometry developed as part of its partnership with SpookFish (the "Pod") was installed by employees of Air America, SpookFish, and Pictometry on a Piper Aztec aircraft bearing tail number N62553, owned or operated by Air America (the "Pod Aircraft").

59.    Air America agreed to fly the Pod Aircraft and to provide to Pictometry the images and data captured by the Pod, as provided in the ASA.

60.    The ASA provides that "Pictometry shall have and retain sole and exclusive ownership and all right, title, and interest in and to all parts of the Pictometry Technology, and all copyrights, patents, and other proprietary rights in or associated with the Pictometry Technology and Pictometry software." *See* Ex. A ¶ 6e.

61.    At no time have Pictometry or Air America modified the provision recited in the preceding paragraph, or otherwise agreed or stated that the Pod would become Air America's property or that Air America would in any way have any proprietary rights over the Pod.

62.    Indeed, most recently in a letter regarding the Pod dated June 21, 2018, Air America made "clear that it *disclaims any ownership interest* therein." (Emphasis added.)

63.    Pictometry, as acknowledged by Air America, has the right to possess the Pod.

64.     The ASA contains strict confidentiality obligations governing Air America's use of Pictometry's confidential information.

65.     Paragraph 6a of the ASA states that Air America:

agrees that it will not at any time, disclose, discuss, provide a copy of, or disseminate the Pictometry Technology, or any part thereof to any person other than those who specifically need to obtain access thereto or knowledge thereof in order to perform Pictometry Services and its other obligations under [the ASA].

66.     Further, under Paragraph 1g, Air America has an obligation under the ASA to not engage in competition with Pictometry during the Term:

During the Term, [Air America] shall not engage in or render services for any other business in any manner that prevents or interferes with [Air America's] provision of the Pictometry Services hereunder and [Air America] shall not engage or assist others in engaging in competition with Pictometry by providing services to capture geo-referenced oblique imagery for any other party within the continental United States.

### *Air America Refuses to Return the Pod*

67.     In October 2017, Air America ceased flying the Pod, and refused to respond to Pictometry's inquiries about the Pod.

68.     During the week of October 30, 2017, Pictometry attempted to contact Air America on numerous occasions, seeking information Pictometry needed to obtain Federal Aviation Administration certification for the Pod Airplane, but Air America refused to provide the necessary data.

69.     Pictometry attempted thereafter to communicate with Air America repeatedly, but Air America remained unresponsive.

70.     In light of Air America's refusal to fly the SpookFish Aircraft, Pictometry asked Air America to remove the Pod from the SpookFish Aircraft and return it to Pictometry for further testing, development and deployment elsewhere.

71.     On November 16, 2017, Erica Womer, Pictometry's then-Acting General Counsel, first requested return of the Pod from Armando Ramirez, Air America's outside counsel.

72.     Pictometry anticipated that this request would be resolved quickly and easily, as there was no question that Pictometry—not Air America—held proprietary rights to the Pod and the exclusive possessory interest therein pursuant to the SpookFish Agreement and the ASA.

73.     Instead, Air America has manufactured ever-changing obstacles to the return of the Pod.

74.     For example, Air America raised purported concerns about which entity would bear the liability for any damages caused to the Pod Aircraft in the Pod removal process.

75.     To assuage these concerns, Ms. Womer emailed Melissa Booth, Air America's Managing Member, on November 17, 2017 and offered to buy the Pod Aircraft from Air America.

76.     Not content with this solution, on November 30, 2017, Ms. Booth instead asserted that Air America would not return the Pod unless and until Pictometry entered an agreement specifically governing the return of the Pod.

77.     Although the ASA already provides for the return of Pictometry's equipment to Pictometry, Pictometry acquiesced and agreed to negotiate such an agreement to get the Pod back.

78.     When Air America insisted that the agreement come in the form of a new, standalone contract, rather than as an amendment to the ASA, Pictometry again acquiesced and agreed to negotiate a separate agreement governing return of the Pod (the "Equipment Removal Agreement").

79.     The Parties proceeded to negotiate the Equipment Removal Agreement for several months, with Air America consistently raising new purported issues with the Pod's return, and Pictometry consistently addressing such issues.

80.    For example, despite having invoiced Pictometry for the Pod for months, Air America demanded that Pictometry represent and warrant that it had the right to own the Pod before Air America would agree to return it to Pictometry.

81.    Despite the unreasonable nature of this request, Pictometry complied.  On March 15, 2018, not only did Pictometry warrant that it had full right and authority to obtain and possess the Pod, but Pictometry also agreed to defend Air America at Pictometry's own expense against any third party claim regarding possession of the Pod, and to hold Air America harmless for losses incurred in connection with those claims.

82.    Air America still refused to return the Pod or allow Pictometry access to the Pod Airplane.

83.    Similarly, on March 30, 2018, Air America asserted that only a licensed airframe technician—not Pictometry personnel—could disassemble the Pod Airplane.

84.    That very same day, to allay Air America's concerns, Pictometry offered to retain and pay a licensed third party, Momentum Aeronautics, LLC, to remove the Pod and restore the Pod Airplane to its original condition.  Still, Air America refused to return the Pod.

85.    After months of jumping through Air America's concocted hoops, the Parties neared the end of their negotiations of the Equipment Removal Agreement.

86.    Perhaps sensing that they would no longer be able to use the Equipment Removal Agreement negotiations as an excuse to avoid returning the Pod, Air America created a new obstacle.

87.    On April 4, 2018, Ms. Booth suddenly announced that Air America would not finalize the Equipment Removal Agreement until Air America and Pictometry finished negotiating an unrelated renewal to the ASA.

88.     That is, although Air America required Pictometry to enter a new agreement governing the removal of the Pod for the stated reason that the ASA did not relate to the Pod, Air America now took the position that renewal of the ASA was a necessary prerequisite to removal of the Pod.

89.     At this point it became clear that Air America had no intention of returning the Pod, and was using its continued possession as leverage to extract terms in the ASA renewal discussions.

90.     Due to Air America's unreasonable actions, Pictometry promptly disengaged with Air America in ASA renewal discussions.

91.     On June 8, 2018, Air America sent a letter purporting to terminate the ASA.

92.     In response, by letter dated June 15, 2018, Pictometry again demanded return of the Pod.

93.     Despite the fact that Air America has no proprietary rights to the Pod, that Pictometry has met each of Air America's stated practical and contractual concerns about returning the Pod, and that the Pictometry and Air America relationship is at its end, still the Pod sits, languishing, on an Air America aircraft.

94.     Air America's withholding of the Pod is no mere inconvenience.

95.     Every day that Pictometry cannot operate the Pod, it loses both monetary and non-monetary value.

96.     First, the Pictometry equipment, when not sitting idly in Air America's hands, can be used to generate significant revenue, potentially exceeding $40,000 per day.

97.     Thus, the estimated lost revenue attributable to Air America's refusal to return the Pod for more than six months (and counting) exceeds $7,000,000.

98.    Second, Air America's refusal to return the Pod has impeded Pictometry's efforts to compete in the aerial imaging space and expand throughout North America and beyond.

99.    Without continued flying and testing of this new, revolutionary equipment, Pictometry will be impaired in its ability to bring it to market on a large scale, or to grow Pictometry's business on a timeline sufficient to keep up with global expansion of Pictometry's competitors.

100.    For more than seven months, Pictometry has lost out on the revenue, know-how, and competitive advantage it would have derived from the Pod, but for Air America's wrongful refusal to return the Pod to Pictometry.

101.    Every day that Air America continues to wrongfully retain the Pod increases the irreparable harm Pictometry has already suffered.

### *Air America Cancelled Required Insurance*

102.    Air America also breached the ASA by cancelling an insurance policy that it was contractually required to maintain during the ASA's Term.

103.    Paragraph 12 of the ASA provides:

During the Term, Vendor shall furnish proof that Vendor has insurance coverage in effect for the following:

(i) Workers Compensation covering all persons providing all Pictometry Services on behalf of Vendor and all risks to such persons under this Agreement;

(ii) Comprehensive General Liability Insurance of not less than one million dollars ($1,000,000) per occurrence; and

(iii) Aircraft Liability Insurance of not less than one million dollars ($1,000,000) per occurrence, with one hundred thousand dollars ($100,000) per aircraft passenger.

104.    In accordance with the ASA, on May 14, 2018, Air America was issued an insurance policy from Florida Workers' Compensation Joint Underwriting Association, Inc. (the "Insurance Company"), Policy No. 6FR13UB-6G44399-A-18 (the "Insurance Policy").

105.    Pursuant to Paragraph 12 of the ASA, Air America was required to maintain the Insurance Policy until September 15, 2018, the end of the ASA's Term.

106.    However, on May 14, 2018, the Insurance Company sent a cancellation notice to Pictometry, informing Pictometry that Air America had cancelled the Insurance Policy, effective June 18, 2018.

107.    A true and correct copy of the cancellation notice is attached as Exhibit B.

108.    Notwithstanding its cancellation of required insurance, Air America still possesses the Pictometry Technology in violation of the ASA and Pictometry's possessory rights, putting Pictometry Technology at serious risk.

109.    And since Air America continues to hold the Pod despite disclaiming any right to do so, Air America must procure and continue to maintain required insurance policies, which now provide primary coverage in the event of loss or damage, to cover this highly valuable, proprietary equipment until it is safely returned to Pictometry.

### Air America Terminates The ASA But Refuses To Confirm That It Is Honoring Its Non-Compete And Confidentiality Obligations Competes With Pictometry

110.    On June 8, 2018, after learning that Pictometry would not agree to Air America's proposed ASA renewal terms, Air America's Ms. Booth sent a letter to Rishi Daga, Pictometry's President, informing Mr. Daga that, pursuant to Section 3 of the ASA, Air America was terminating the ASA as of the end of its Term (the "Termination Letter").

111.    A true and correct copy of the Termination Letter is attached as Exhibit C.

112. In the Termination Letter, Air America acknowledged that, until the end of the Term, the ASA "shall remain in full force and effect."

113. The continuation of the contract through September 15 includes Air America's obligations to not engage in competition with Pictometry through the duration of the Renewal Term, and to safeguard the considerable proprietary information that Pictometry has provided Air America throughout the course of their relationship.

114. Air America's confidentiality and non-competition obligations are clear, and apply not just during the ASA's Term, but after its termination. *See* Ex. A ¶¶ 1g, 6d.

115. Paragraph 6a of the ASA further provides that Air America "will not at any time disclose, discuss, provide a copy of, or disseminate the Pictometry Technology, or any part thereof to any person other than those who specifically need to obtain access thereto or knowledge thereof in order to perform Pictometry Services and its other obligations under the [ASA]," will "protect [Pictometry Technology] against unauthorized use, disclosure, copying, and dissemination," and will limit access to Pictometry Technology strictly to "employees who are authorized to use the Pictometry Technology in accordance with the terms of the ASA."

116. Paragraph 6b mandates that Air America "use best efforts to assure that its own personnel and any other third Parties who may have access to Pictometry Technology . . . will not unlock, decompile or reverse engineer or otherwise disassemble any part of the Pictometry Technology."

117. In light of Air America's termination of the ASA and its ongoing unexplained refusal to return the Pod, Pictometry grew increasingly concerned about Air America's potential misuse of Pictometry's confidential information, whether for its own purposes or in violation of the non-compete provision of the ASA.

118.    Accordingly, Pictometry requested on June 15, 2018 that, pursuant to Paragraph 6c of the ASA, Air America and any personnel with access to any Pictometry Technology provide written statements confirming and acknowledging the confidentiality and non-competition obligations described in Paragraph 6 of the ASA, and to confirm that Air America has not engaged and will not engage in any activities that violate the ASA.

119.    Air America has yet to provide the required certifications, in further breach of the ASA. *See* Ex. A ¶ 6c ("Pictometry shall have the right, in its sole discretion, to require each [Air America] officer, employee, and agent with access to the Pictometry Technology, to execute confidentiality and trade secret agreements to protect its rights in the Pictometry Technology.").

120.    In short, Pictometry has made every effort to facilitate the return of the Pod, jumping over every obstacle created by Air America, including by attempting to resolve the issue by agreeing to a separate equipment removal contract and even by offering to buy the entire Pod Aircraft to assuage any concerns about the uninstallation process.

121.    But Air America has refused to cooperate with Pictometry, and embarked on a calculated path to harm Pictometry's competitive advantage and increase Air America's own profitability. Air America deliberately prolonged negotiations with Pictometry regarding the return of the Pod, conditioning the return of the Pod on the renewal of the ASA.

122.    All the while, Air America knew that it was planning to terminate the ASA as of the end of the Term if Pictometry elected not to renew it, and planning to withhold the Pod.

123.    Air America's schemes have cost Pictometry significant resources and caused significant and irreparable harm, and Pictometry now seeks this Court's intervention to redress that harm.

## FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

124.   Pictometry incorporates and re-alleges each of the foregoing allegations in paragraphs 1-134 as though fully set forth in this section.

125.   Pictometry and Air America entered into the ASA on September 15, 2015.

126.   Pictometry has performed all of its obligations under the ASA.

127.   Air America breached the ASA by, among other things:

(i)   refusing to remove and return all Pictometry Technology in breach of ASA Paragraph 1;

(ii)   terminating the Insurance Policy before the end of the Term in breach of ASA Paragraph 12;

(iii)   using or disclosing Pictometry's confidential information without authorization in breach of ASA Paragraph 6; and

(iv)   refusing to provide written statements confirming and acknowledging the confidentiality and non-competition obligations in breach of ASA Paragraph 6.

128.   Air America's conduct, including its willful refusal to return the Pod to Pictometry, permits the rational inference that discovery will identify additional breaches, and additional damage to Pictometry as a result of those breaches.

129.   As a direct and proximate result of Air America's breaches of the ASA, Pictometry has suffered damages in an amount to be proven at trial, but which it believes will exceed $7,000,000.

## CLAIM FOR RELIEF 2: ANTICIPATORY BREACH OF CONTRACT

130.   Pictometry incorporates and re-alleges each of the foregoing allegations in paragraphs 1-140, as though fully set forth in this section.

131.   Pictometry and Air America entered into the ASA on September 15, 2015.

132.   Pictometry has performed all of its obligations under the ASA.

133. Air America has positively and unequivocally stated or demonstrated that it intends not to perform as required under the ASA, including by, among other things:

(i) refusing to return all Pictometry Technology as required under the ASA; and

(ii) refusing to maintain insurance coverage required under the ASA.

134. As a direct and proximate result of Air America's anticipatory breach of the ASA, Pictometry has suffered damages in an amount to be proven at trial.

## CLAIM FOR RELIEF 3: UNJUST ENRICHMENT

135. Pictometry incorporates and re-alleges each of the foregoing allegations in paragraphs 1-145, as though fully set forth in this section.

136. Pictometry conferred a benefit on Air America by, among other things, providing the Pod to Air America, along with Pictometry's confidential information that enabled Air America to utilize the Pod.

137. Air America has knowledge of the benefits provided by Pictometry, and has accepted or retained that benefit by, among other things, refusing to return the Pod to Pictometry, and misusing the Pictometry's confidential information provided Air America in violation of the ASA for Air America's own benefit.

138. This benefit conferred on Air America comes at the expense of Pictometry.

139. It is against equity and good conscience to permit Air America to retain the Pod and utilize Pictometry's confidential information at the expense of Pictometry.

140. Pictometry has been damaged as a result of the unjust enrichment of Air America.

## CLAIM FOR RELIEF 4: CONVERSION

141. Pictometry incorporates and re-alleges each of the foregoing allegations in paragraphs 1-150, as though fully set forth in this section.

142. Pictometry licenses the Pod from SpookFish, and has the right to possess the Pod.

143.    Consistent with that license, Pictometry provided the Pod to Air America and authorized Air America to install the Pod on one of Air America's aircraft.

144.    On November 16, 2017, and on numerous occasions thereafter, Pictometry demanded the return of the Pod from Air America.

145.    Air America acknowledged that it has no right, title or interest in the Pod, yet intentionally refused to return the Pod, in an attempt to leverage negotiation of a renewed ASA and equipment removal agreement with Pictometry.

146.    Air America's refusal to return the Pod has interfered with Pictometry's exclusive right of possession of the Pod.

147.    Pictometry has been damaged as a result of the conversion of the Pod, and demands preliminary and permanent injunctive relief directing the return of the Pod, together with such ancillary damages as will be determined at trial, as well as punitive and exemplary damages sufficient to punish Air America for its intentional and wanton acts, and to deter others from acting in a similarly unlawful manner.

### CLAIM FOR RELIEF 5: MANDATORY INJUNCTION

148.    Pictometry incorporates and re-alleges each of the foregoing allegations in paragraphs 1-158, as though fully set forth in this section.

149.    Pictometry has a distinct likelihood of success on the merits of its claims in this action, including without limitation its claims for breach of contract and conversion.

150.    Among the relief sought by Pictometry in connection with its claims for relief in this action is: (a) the immediate return of all Pictometry Technology, including the Pod, to Pictometry; (b) a direction that Air America will not use any of Pictometry's confidential information, including to compete with or assist others to compete with or prepare to compete with

Pictometry; and (c) reinstatement of all insurance required under the ASA until all Pictometry Technology is returned to Pictometry, including but not limited to the Pod.

151.    Absent preliminary and permanent injunctive relief directing these elements of relief, Pictometry will suffer irreparable injury.

152.    The balance of the equities tips decidedly in Pictometry's favor.

## **REQUESTED RELIEF**

WHEREFORE, Pictometry requests a judgment as follows:

(i)    For compensatory damages in an amount to be determined according to proof at any trial in this matter, but not less than $7,000,000;

(ii)   For punitive and any other available damages, in an amount to be set by the trier of the facts but sufficient to punish Air America and to deter similar future wanton and willful misconduct;

(iii)  For preliminary and permanent injunctive relief requiring Air America to: (a) immediately return of all Pictometry Technology, including the Pod, to Pictometry; (b) confirm that Air America has not and will not use any of Pictometry's confidential information, including to compete with or assist others to compete with or prepare to compete with Pictometry; and (c) reinstate all insurance required under the ASA until all Pictometry Technology is returned to Pictometry, including but not limited to the Pod;

(iv)   For costs of suit, including costs, expenses and reasonable attorney fees incurred by Pictometry in prosecuting this litigation; and

(v)    For such other further relief as the Court may deem just and proper.

Dated: June 29, 2018                        WARD GREENBERG HELLER & REIDY LLP

                                            s/Thomas S. D'Antonio
                                            Thomas S. D'Antonio
                                            Tony R. Sears
                                            1800 Bausch & Lomb Place
                                            Rochester, NY 14604
                                            Telephone: (585) 454-0700
                                            Facsimile: (585) 423-5910
                                            tdantonio@wardgreenberg.com
                                            tsears@wardgreenberg.com

-and-

Mark McKane, P.C. (*pro hac vice* forthcoming)
Ashley Littlefield (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
mark.mckane@kirkland.com
ashley.littlefield@kirkland.com

*Attorneys for Plaintiff*
PICTOMETRY INTERNATIONAL CORP.

# EXHIBIT A

## AIR SERVICES AGREEMENT

This **AIR SERVICES AGREEMENT** (this "Agreement") effective as of September 15, 2015 (the "Effective Date") by and between **PICTOMETRY INTERNATIONAL CORP.**, a Delaware corporation with an address at 100 Town Centre Drive, Rochester, New York 14623 ("Pictometry") and **AIR AMERICA FLIGHT CENTER, LLC** a Florida limited liability company, with an address at 1585 Aviation Center Parkway, Hanger 602, Daytona Beach, FL 32114 ("Vendor") (each, a "Party" and, collectively, the "Parties").

**WHEREAS,** Pictometry is in the business of providing products and services based upon geo-referenced aerial imaging and simultaneous geo-positioning data for federal, provincial, local, and other authorities and other third parties (the "Pictometry Product");

**WHEREAS,** Pictometry has developed proprietary technology and equipment (collectively, the "Pictometry Technology") that Pictometry uses to produce the Pictometry Product;

**WHEREAS,** Pictometry requires the services of piloted airborne platforms utilizing the Pictometry Technology to capture geo-referenced aerial imaging with simultaneous geo-positioning data and the performance of other related services (the "Pictometry Services") in order to provide Pictometry Product to its customers, which Pictometry Services must be completed within specified time periods;

**WHEREAS,** Vendor is in the business of owning, operating, maintaining and providing use of aircraft as piloted airborne platforms for purposes of imagery capture; and

**WHEREAS,** Vendor desires to provide Pictometry with the Pictometry Services as provided in this Agreement.

**NOW, THEREFORE**, in exchange for the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Services Provided**

a.    During the Term (as hereinafter defined), Vendor shall provide to Pictometry the services of the aircraft specified on Schedule A to this Agreement (each, an "Aircraft"). All Aircraft specified on Schedule A are identified as being of a particular type. All Aircraft identified on Schedule A as the being of the same type are collectively referred to as a "Type Fleet". Each Aircraft shall be provided as a fully-managed, maintained, airworthy, licensed under applicable law, operational aircraft with qualified pilots suitable for use as a piloted airborne platform to perform the Pictometry Services within the continental United States as needed by Pictometry. Specifications for modifications to each Aircraft required to facilitate use of the Aircraft in performing the Pictometry Services are identified on Schedule B to this Agreement.

b.    During the Term, Vendor shall, as requested by Pictometry from time to time and with reasonable care, receive, unpack, re-pack and ship flight system equipment and Pictometry Technology used by Vendor in connection with performance by Vendor of the Pictometry Services. Pictometry shall be responsible for the payment of all shipping costs (including any shipping insurance requested by Pictometry, and any required import/export documentation fees and duties) for Pictometry's equipment and Pictometry Technology components, including storage media used for captured data storage.

c.    Pictometry shall be permitted access to Aircraft for the purpose of installation and removal of Pictometry Technology for twenty-one (21) days prior to and twenty-one (21) days after the Operating Period (as hereinafter defined). Unless otherwise agreed by Vendor, all Pictometry Technology must be removed from Aircraft within such 21-day period following the Operating Period. During these installation and removal periods, Vendor shall not be liable for loss or damage to Pictometry Technology (except to the extent due to the gross negligence or willful misconduct of Vendor). Vendor shall, however, take all reasonable measures to protect Pictometry Technology from such loss or damage.

d.    Vendor shall permit Pictometry personnel to be present on Aircraft prior, during and after scheduled flights on which Vendor performs the Pictometry Services, at such times as may be required by Pictometry in its

sole discretion. Pictometry agrees that its personnel will comply with all reasonable Vendor safety and security procedures, reimburse Vendor for any additional costs resulting from such presence and to obey the reasonable instructions of Vendor's pilots during such flights.

e.    During the Term, Vendor agrees to assist Pictometry in the temporary installation in and removal of individual components of Pictometry Technology, or as necessary, the complete Pictometry Technology system, in or from Aircraft in accordance with the training and documentation to be provided by Pictometry. Vendor and its personnel shall assist Pictometry in the installation and removal of the Pictometry Technology only when such assistance is requested by or approved in advance by Pictometry. Pictometry will be responsible for installation and removal of the complete Pictometry Technology system at the start and end of the Operating Period and, as needed, for Scheduled Preventive Maintenance (as hereinafter defined).

f.    Vendor shall operate the Aircraft in accordance with all applicable federal and state laws and other regulations, including without limitation Federal Aviation Administration ("FAA") rules and regulations and those with respect to qualification and employment of its pilots. Vendor shall notify Pictometry within three (3) business days of any notification by the FAA or other governmental authority of any infraction, action, or impending action against Vendor for any reason, and regardless of whether or not the infraction, action, or impending action relates to an Aircraft or pilots designated for providing Pictometry Services as provided herein.

g.    During the Term, Vendor agrees to devote Vendor's best efforts, skills and business time and attention as needed to properly provide the Pictometry Services hereunder. During the Term, Vendor shall not engage in or render services for any other business in any manner that prevents or interferes with Vendor's provision of the Pictometry Services hereunder and Vendor shall not engage or assist others in engaging in competition with Pictometry by providing services to capture geo-referenced oblique imagery for any other party within the continental United States.

**2.    Aircraft and Pilot Availability**

a.    Subject to Paragraph 9 below, Vendor shall provide piloted Aircraft for Pictometry Services seven (7) days per week. Each Aircraft shall be available twelve (12) hours per day, with a qualified pilot available eight (8) hours per day, for each Aircraft. As requested by Pictometry, flight times shall be conducted within the image capture window. The image capture window for purposes of this Paragraph 2 is considered to be 2 hours after sunrise to 2 hours before sunset. However, flight times may be requested prior to and after the image capture window to transport Aircraft to and from the designated image target area. Vendor acknowledges that Pictometry's ability to timely provide Pictometry Product to its own customers is a material element of the performance of Pictometry Services pursuant to this Agreement, and that Vendor obligations under this Paragraph 2 are intended to ensure that Vendor maintains the availability of Aircraft for performance of Pictometry Services throughout the Term. Any obligation to provide Aircraft and pilots as set forth in this Agreement is subject to the Force Majeure provisions set forth in Paragraph 14, below.

b.    Aircraft keys shall be provided to Pictometry personnel by Vendor for access to Aircraft cabins for maintenance of the Pictometry Technology (e.g., the flight rig or other capture equipment) and flight preparation at times when Vendor's pilots are off-duty. Pictometry agrees that its personnel will comply with Vendor's reasonable rules and procedures and security of Aircraft including, but not limited to, Pictometry personnel not moving or operating Aircraft.

c.    Aircraft will be deployed from October 15 through May 15 (the "Operating Period") of each year during the Term.

**3.    Term; Termination of Prior Agreement**

a.    This Agreement shall commence on the Effective Date and shall continue in effect for a period of two (2) years (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive additional one year terms on the same terms and conditions (each such renewal constituting a "Renewal Term" and, collectively with the Initial Term, constituting the "Term"). The above notwithstanding, either Party may, in its sole discretion, terminate this Agreement at the end of the Initial Term or any Renewal Term by providing written notice to the other Party of such termination not less than ninety (90) days prior to the end of the then-current Term.

Air America Air Services Agreement (Imagery) 150722.1

b.  The parties previously entered into an air services agreement with an effective date as of September 15, 2012 (the "Prior Agreement"). Upon this Agreement becoming effective, the Prior Agreement shall automatically terminate, except to the extent of any obligations under the Prior Agreement that remain to be fulfilled with respect to periods prior to the termination.

4.  Compensation

a.  For performance of the Pictometry Services under this Agreement Vendor shall, with respect to each Operating Period during the Term, be paid the minimum monthly charge specified on Schedule A to this Agreement (the "Minimum Monthly Charge") per Aircraft. The Minimum Monthly Charge covers forty (40) hours use of such Aircraft (the "Monthly Minimum Hours"), including pilot and administrative charges, during the month of the Operating Period to which it relates, subject to adjustments for: (i) any increases in fuel charges pursuant to Paragraph 4.b below; and (ii) any decreases resulting from suspension of service pursuant to Paragraph 9, below. Aggregate Type Fleet hours flown in any month in performance of the Pictometry Services in excess of an amount equal to the product obtained by multiplying the Monthly Minimum Hours by the number of Aircraft within that Type Fleet will be billed when incurred at the rate per excess hour specified in Schedule A for such Type Fleet. For the purposes of clarification, the Minimum Monthly Charge and any additional hourly charges paid by Pictometry pursuant to this Agreement include and cover the costs of use of the Aircraft, the pilots (including all pay and benefits), the Aircraft fuel (subject to Paragraph 4.b, below), oil, maintenance, repair and all Aircraft landing and parking fees ("Covered Items"). Unused Monthly Minimum Hours for each Type Fleet shall be carried forward and credited against future overages for that same Type Fleet within the then-current Term. Once the aggregate Type Fleet Monthly Minimum Hours are used in the performance of Pictometry Services in a given month during the Operating Period and all previously unused Type Fleet Monthly Minimum Hours carried forward and credited have been exhausted, Vendor shall invoice Pictometry monthly for each additional hour of use of each Aircraft in the Type Fleet during the month at the rate per excess hour specified in Schedule A for the Type Fleet of such Aircraft.

b.  For each month in each Operating Period, Vendor shall calculate the actual average price per gallon paid by Vendor for fuel used in performing the Pictometry Services (the "Actual Cost") for each Type Fleet and the difference between the Actual Cost and the standard cost per gallon of fuel specified on Schedule A for such Type Fleet (the "Standard Cost"). If the Actual Cost per gallon of fuel paid by Vendor for a Type Fleet during a month is less than the Standard Cost for such Type Fleet, Vendor shall pay Pictometry the resulting difference in total costs for fuel used by such Type Fleet during the month by check on or before the last day of the next month. If the Actual Cost per gallon of fuel paid by Vendor for a Type Fleet during a month is more than the Standard Cost for such Type Fleet, Vendor shall notify Pictometry in writing of that fact and Pictometry shall pay Vendor the resulting difference in total costs for fuel used by such Type Fleet during the month by check on or before the last day of the month following the month in which such notice was received.

c.  Pictometry shall reimburse Vendor monthly at the rate specified on Schedule A for travel per diems properly paid by Vendor to its pilots performing the Pictometry Services requiring travel away from the Pictometry-approved Vendor base location for the corresponding Aircraft during the Operating Period.

d.  Pictometry shall reimburse Vendor monthly for hanger fees incurred while Aircraft are performing the Pictometry Services requiring travel away from the Pictometry-approved Vendor base location for the corresponding Aircraft during the Operating Period.

5.  Invoicing
a.  Vendor will submit two invoices per calendar month to Pictometry. The first invoice shall be sent on the first (1st) of each month with respect to all applicable Monthly Minimum Charges. This invoice will be due and payable within twenty (20) business days of receipt of invoice from Vendor. A second invoice shall be submitted by Vendor to Pictometry for the previous month's reimbursable additional expenses, such as travel per diems, hanger fees and Aircraft hours in excess of the Fleet Monthly Minimum Hours less any unused hours carried forward, as the case may be, as provided in this Agreement. Vendor's invoice will include an adequately detailed description of the additional time and expenses being billed to Pictometry, as well as receipts supporting fuel expenditures and other reimbursable expenses, to facilitate verification. The second monthly invoice shall be sent to Pictometry by the fifth (5th) day of the month and payment shall be due and payable by the last day of the month.

Page 3 of 9

Air America Air Services Agreement (Imagery) 150722.1

Scanned by CamScanner

b.    In the event Pictometry fails to make payment to Vendor on the last day for which payment is due, Vendor shall send written notice to Pictometry of its failure to pay, which shall be deemed notice of breach pursuant to Paragraph 10. Payment of any disputed sums by Pictometry shall not be deemed an admission or acceptance of any disputed amount by Pictometry provided the payment is made under protest and identifies the dispute.

**6.   Intellectual Property & Equipment**

Vendor recognizes the proprietary nature and the value of Pictometry Technology and all other intellectual property of Pictometry including, without limitation, as described in specifications provided to Vendor and agrees that:

a.    Pictometry Technology is a commercially valuable, proprietary product of Pictometry, the design and development of which reflect the effort of skilled scientists and technicians and the investment of considerable time and resources. Pictometry Technology is treated by Pictometry as confidential and contains substantial trade secrets of Pictometry. Pictometry is entrusting these trade secrets to Vendor and its employees and agents in confidence solely so that Vendor may perform the Pictometry Services and its other obligations under this Agreement and for no other purpose whatsoever. Vendor agrees that it will not at any time, disclose, discuss, provide a copy of, or disseminate the Pictometry Technology, or any part thereof to any person other than those who specifically need to obtain access thereto or knowledge thereof in order to perform Pictometry Services and its other obligations under this Agreement. Vendor agrees to use all reasonable efforts to ensure: (i) that access to the Pictometry Technology and each part thereof will be strictly limited to employees who are authorized to use the Pictometry Technology in accordance with the terms of this Agreement; and (ii) that Vendor's own personnel and any others afforded access to the Pictometry Technology, including maintenance and repair crews for the Aircraft, will protect it against unauthorized use, disclosure, copying, and dissemination; (iii) that neither Vendor or its personnel shall disclose the purpose of its work under this Agreement except on an as needed basis in order to perform the Pictometry Services.

b.    Vendor agrees that, in connection with the performance of the Pictometry Services, Vendor will use best efforts to assure that its own personnel and any other third Parties who may have access to Pictometry Technology, including without limitation any software which is part of the Pictometry Technology, will not unlock, decompile or reverse engineer or otherwise disassemble any part of the Pictometry Technology, so as to find, uncover or disclose the source code or other trade secrets included therein or for any other purpose.

c.    Vendor shall use best efforts to ensure that persons employed by it, or under its direction and control, abide by the terms and conditions of this Agreement. Pictometry shall have the right, in its sole discretion, to require each Vendor officer, employee, and agent with access to the Pictometry Technology, to execute confidentiality and trade secret agreements to protect its rights in the Pictometry Technology.

d.    The obligations of Vendor set forth in this Paragraph shall continue to be binding upon Vendor and its officers, employees, and agents after the expiration or termination of this Agreement.

e.    Vendor acknowledges and agrees that Pictometry shall have and retain sole and exclusive ownership and all right, title, and interest in and to all parts of the Pictometry Technology, and all copyrights, patents, and other proprietary rights in or associated with the Pictometry Technology and Pictometry software, including, but not limited to the data and images which are created from Vendor's services under this Agreement utilizing the Pictometry Technology and Pictometry software (the "Proprietary Rights"). Vendor agrees: (i) that it will not, during or after the Term, assert or claim any interest in, or do anything directly or indirectly that may adversely affect the validity of or infringe any Proprietary Rights; (ii) that it will use best efforts to protect the Proprietary Rights and to cooperate in Pictometry's efforts to protect the property of Pictometry, including the Pictometry Technology and Proprietary Rights, as Pictometry may from time to time instruct; and (iii) that it will notify Pictometry promptly of any known or suspected breach of any Proprietary Rights that comes to Vendor's attention.

f.    The Parties agree that the unauthorized use or disclosure of the Pictometry Technology by Vendor and/or its officers, employees, or agents would cause irreparable harm to Pictometry and that any breach or threatened breach by Vendor and/or its officers, employees, and agents of any provision of this Paragraph 6 cannot be remedied solely by damages. Accordingly, in the event of a breach or threatened breach by Vendor and/or its officers, employees, and agents of any of the provisions of this Paragraph 6, Pictometry shall be entitled to seek injunctive relief restraining Vendor and any business, firm, partnership, individual, corporation, or other entity participating in the breach or threatened breach. Nothing herein, however, shall be construed as prohibiting Pictometry from pursuing any other remedies available at law or in equity for any such breach or threatened breach, including the recovery of damages, costs, and reasonable attorney's fees. If any part of this Paragraph 6 is found by a court of competent jurisdiction to be unreasonably broad, it shall nevertheless be enforceable to the extent reasonably necessary for the reasonable protection of Pictometry.

Page **4** of **9**

Air America Air Services Agreement (Imagery) 150722.1

g.    Vendor acknowledges that it has no proprietary interest in the Pictometry Technology or the Proprietary Rights, nor will it acquire any such interest as a result of this Agreement, and shall take all reasonable actions to protect the Pictometry Technology and Proprietary Rights from all claims, including claims of the Vendor's creditors, secured, unsecured, and any lien claimants. If requested, the Vendor will secure a written acknowledgment from any secured creditor that such secured creditor has no interest in the Pictometry Technology or Proprietary Rights.  In the event that any creditor advances a claim against any Aircraft, Vendor will immediately notify Pictometry in writing and if requested by Pictometry, facilitate the immediate removal of the Pictometry Technology.

### 7.  Aircraft Modification Documents

a.    To the extent there are any required modifications to any Aircraft required to perform the Pictometry Services, Vendor shall cause such modifications to be made to meet Pictometry's requirements. Vendor agrees that prior to its implementation of the modifications to any Aircraft, that it will provide a copy of the proposed plans and documentation for such modifications to Pictometry for review and approval before beginning work or seeking FAA approvals.  Documentation regarding the modifications will be obtained and generated by Vendor in the process of performing the modifications and obtaining FAA approval, except applicable FAA forms, e.g. form 8110-3 associated with belly hole and exhaust modifications.  Vendor also shall submit to Pictometry photocopies of all documentation regarding airframe modifications including internal use documents and formal documents submitted to the FAA (including Supplemental Type Certificates, Field modifications, and Designated Engineering Representative reports).  These documents will be provided within thirty (30) days of their generation or receipt by Vendor.  As documents are modified with enhancements, updated documents will be forwarded to Pictometry.

b.    Where permissible, and with prior approval of the Vendor both Parties shall have unlimited rights to utilize the data and designs which are represented by these aircraft modification documents.

### 8.  Employment and Utilization of Pilots

a.    Vendor agrees that it will utilize only its own employees and/or contractors as pilots.  Vendor acknowledges and agrees that it will be responsible for the payment of all of its pilots' wages, benefits, and employment related taxes and expenses, and for any overtime, including without limitation, out of pocket food, lodging and other expenses incurred by its pilots for overnight stays in performing Pictometry Services. Vendor represents to Pictometry that all pilots performing Pictometry Services will be fully licensed commercial and instrument flight rules (IFR)-rated pilots.

b.    Vendor will supply a spare, on-call pilot for the duration of each Operating Period. The spare pilot will be fully trained and will be available to fill in and substitute for Vendor pilots on an as-needed basis.

### 9.  Aircraft Performance Requirements

a.    During the Operating Period each Aircraft shall be available and flight-ready for Pictometry's use no less than ninety percent (90%) of hours of availability specified in Paragraph 2, above.  Excluded from the calculation of Aircraft availability is the time that an Aircraft is unavailable due to Scheduled Preventive Maintenance (as hereinafter defined).  Vendor shall use reasonable efforts to perform Scheduled Preventive Maintenance outside of the Operating Period.  For any Aircraft for which the availability is less than ninety percent (90%) during any sixty (60) consecutive day period, Vendor shall credit Pictometry, at the rate of five hundred dollars ($500) per day of unavailability as compensation to Pictometry for missed opportunity, subject to the Force Majeure provisions provided below; provided, however, in no event shall Vendor be required to compensate Pictometry more than once for unavailability of any individual Aircraft on a single day.

b.    "Scheduled Preventive Maintenance" means all mandated maintenance and inspections required by FAA including, but not limited to, Aircraft inspections, scheduled maintenance and mandated repairs. Vendor shall use best efforts to minimize unavailability of Aircraft for Pictometry Services due to Scheduled Preventive Maintenance.

### 10.  Default/Termination

In the event of any breach of any provision of this Agreement by either Party, the non-breaching Party shall give written notice to the breaching Party of the nature of the breach, and the breaching Party shall have ten (10)

business days to remedy same. If the breaching Party has not remedied such breach within the ten (10) business day period, the non-breaching Party may terminate this Agreement effective immediately upon receipt of notice containing such termination and seek appropriate remedies at equity or law.

### 11. Records Inspection

With respect to all Aircraft used by Vendor in performing Pictometry Services, Pictometry shall have the right to review at any time, all records relating to the Aircraft and the pilots, including but not limited to Aircraft, engine, and propeller log books.

### 12. Insurance Coverage

a.  During the Term, Vendor shall furnish proof that Vendor has insurance coverage in effect for the following:

(i)  Workers Compensation covering all persons providing all Pictometry Services on behalf of Vendor and all risks to such persons under this Agreement;

(ii)  Comprehensive General Liability Insurance of not less than one million dollars ($1,000,000) per occurrence; and

(iii)  Aircraft Liability Insurance of not less than one million dollars ($1,000,000) per occurrence, with one hundred thousand dollars ($100,000) per aircraft passenger.

b.  All of Vendor's insurance policies, with the exception of the Workers Compensation, shall contain additional endorsements naming Pictometry as an additional insured with respect to liabilities arising in the performance of Pictometry Services hereunder and require the insurer to provide at least thirty (30) days prior written notice to Pictometry of any expiration or termination of coverage. Immediately upon execution of this Agreement, Vendor shall provide Pictometry with proof of such insurance.

c.  During the Term, Pictometry shall be responsible for obtaining and maintaining Insurance against casualty loss and damage to components of Pictometry Technology.

### 13. Indemnification

Vendor agrees to and does hereby indemnify, protect, defend and hold harmless Pictometry and its officers, directors, management, stockholders, and employees from and against any and all claims, losses, liabilities, judgments, penalties, damages, actions, suits, demands, costs and expenses, including, without limitation, reasonable attorneys' fees resulting from Vendor's gross negligence or willful misconduct in the performance of its duties hereunder.

### 14. Miscellaneous.

a.  No amendment, modification or waiver of any provision of this Agreement shall be binding unless made in writing and duly signed by both Parties.

b.  Pictometry and Vendor may, through mutual agreement, by an instrument in writing extend the time for or waive the performance of any of the obligations of the other or waive compliance by the other with any of the covenants, or waive any of the conditions to its obligations, contained herein. No such extension of time or waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure unless specifically agreed to in writing.

c.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by Vendor without the prior written consent of Pictometry.

d.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of law principles.

e.  The Parties hereby irrevocably: (i) submit, in any legal proceeding relating to this Agreement, to the exclusive jurisdiction of any state or United States court of competent jurisdiction sitting in the State of New York, Monroe County, and agree to suit being brought in any such court; (ii) agree to service of process in any such legal proceeding by mailing of copies thereof (by registered or certified mail, if available) postage prepaid at the addresses set forth above; and (iii) agree that nothing contained herein shall affect a Party's right to effect service of process in any other manner permitted by law. The Parties hereby waive their rights to a trial by jury.

Page **6** of **9**

Air America Air Services Agreement (Imagery) 150722.1

f.    All notices and other communications to be given to a Party pursuant to this Agreement shall be given in writing sent to such Party at the respective address set forth above (or at such other address as such Party has specified by notice hereunder) and: (i) delivered personally; or (ii) mailed by registered or certified mail (postage prepaid, return receipt requested); or (iii) delivered by reputable overnight courier providing written receipt of delivery. Notices shall be deemed given when actually received or when delivery is refused.

g.    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all previous agreements, promises, representations, understandings and negotiations, whether written or oral.

h.    In the event any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of the Agreement shall remain in full force and effect.

i.    Neither Party shall be liable for failure to perform under this Agreement due to force majeure, being for purposes of this Agreement, unforeseeable circumstances beyond such Party's reasonable control including, but not limited to, labor strikes, severe weather conditions, war, national emergency, fuel unavailability, catastrophic event, acts of terrorism and acts of God. A Party's failure to perform hereunder shall only be excused for so long as the event of force majeure continues.

j.    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same Agreement, and shall become effective when one or more counterparts have been signed by both Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement by the duly authorized representative of each, to be effective as of the Effective Date.


| AIR AMERICA FLIGHT CENTER, LLC | PICTOMETRY INTERNATIONAL CORP. |
|---|---|
| **By:** | **By:** |
| Signature: _Melis Booth_ | Signature: _(signature)_ |
| Name: _Melissa Booth_ | Name: _Linda K. Salpini_ |
| Title: _Managing Member_ | Title: _Sr. Vice President, Finan_ |
| Date: _8/3/15_ | Date: _8-10-15_ |

Air America Air Services Agreement (Imagery) 150722.1

**Schedule A:**

Aircraft Type; Number; Billing Rates; Fuel; Standard Fuel Costs:

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rate Per Excess Hour | Pilot Per Diem Rate | Fuel Type | Standard Fuel Costs Per Gallon |
|---|---|---|---|---|---|---|
| Cessna 172 | 19 | $10,000.00 | $115.00 | $150.00 | Avgas | $3.50 |

| Type of Aircraft | Number of Aircraft per Type | Minimum Monthly Charge per Aircraft | Rate Per Excess Hour | Pilot Per Diem Rate | Fuel Type | Standard Fuel Costs Per Gallon |
|---|---|---|---|---|---|---|
| Piper Aztec | 11 | $16,000.00 | $300.00 | $175.00 | Avgas | $3.50 |

All rates and fees except Standard Fuel Costs Per Gallon exclude applicable taxes.

Air America Air Services Agreement (Imagery) 150722.1

**Schedule B:**

**List of Specifications for Required Aircraft Modifications**

Cessna Model 172 aircraft require field modification 8110-3, specifications for which are available from Pictometry upon request.

Air America Air Services Agreement (Imagery) 150722.1

# EXHIBIT B

FWCJUA FLORIDA WORKERS' COMPENSATION
JOINT UNDERWRITING ASSOCIATION, INC.

2420 LAKEMONT AVE    STE 200
ORLANDO   FL              32814

PICTOMETRY INTERNATIONAL CORP
25 METHODIST HILL DR
ROCHESTER                    NY 14623

[X] **CANCELLATION NOTICE.** Please take notice that the Policy designated below, issued to the insured named below, has been canceled. Your interest under the Policy is canceled effective on the date stated below.

[ ] **NOT TAKEN NOTICE.** Please take notice that the Insured named below has not accepted the Policy designated below and therefore no insurance has come into force thereunder.

[ ] **AMENDMENT NOTICE.** Please take notice that, effective on the date stated below, the Policy designated below has been amended as follows:

[ ] **NON-RENEWAL NOTICE.** Please take notice that we have advised the insured that this Policy will not be renewed.

[ ] **REWRITE NOTICE.** Please take notice that the Policy designated below has been canceled; however, it is being rewritten.

| POLICY NUMBER: (6FR13UB-6G44399-A-18) | ISSUE DATE: 05-14-18 |
|---|---|
| **NAME AND ADDRESS OF INSURED**<br>AIR AMERICA FLIGHT CENTER LLC<br>&<br>1585 AVIATION CENTER PARKWAY<br># 602<br>DAYTONA BEACH          FL  32114 | **PRODUCER OR AGENT**<br>ALEXANDER AVIATION ASSOC          24NBK<br><br>**ISSUING OFFICE**<br>FLORIDA WC JUA    821 |
| **EFFECTIVE DATE OF THIS NOTICE**<br>06-18-18 | **VEHICLE IDENTIFICATION**<br>*(Complete for Auto Policies or Coverages Only)* |
| **LOCATION**<br>*(Complete for Fire Policies or Fire Coverages ONLY)* | |

**WRITTEN NOTICE IS HEREBY GIVEN TO YOU AS:**

[X] THE PERSON TO WHOM AN INSURANCE CERTIFICATE WAS ORIGINALLY ISSUED OR A BANK OR FINANCE COMPANY;

[ ] AN ADDITIONAL INSURED UNDER THE TERMS OF THE POLICY;

[ ] A MORTGAGEE

**THIS NOTICE IS GIVEN ONLY BY THE COMPANY OR COMPANIES WHICH ISSUED THE POLICY DESIGNATED ABOVE.**

CN 00 3A 03 94

Page 1 of 1

# EXHIBIT C

[Letterhead of Air America Flight Center, LLC]

June 8, 2018

Mr. Rishi Daga, President
Pictometry International Corp.
25 Methodist Hill Drive
Rochester, NY  14623

**VIA ELECTRONIC MAIL *and* FIRST CLASS MAIL**

Re:  Uninstallation of Pictometry Equipment, Outstanding Amounts, and Termination by Non-Renewal of Agreements.

Dear Mr. Daga:

We refer to the Air Services Agreement (the "***Agreement***"), dated September 15, 2015 by and between Pictometry International Corp. ("***Client***" or "***you***") and Air America Flight Center, LLC ("***Vendor***" or "***we***").  By means of this letter ("***Letter***"), Vendor is notifying Client of logistics options for Vendor's removal of equipment owned by it ("***Equipment***") from Vendor aircraft on which such Equipment is presently installed ("***Aircraft***"), and is also notifying Client of Vendor's election to terminate the Agreement as of the last day of the current Renewal Term (as defined therein).

### *Uninstallation Logistics*

Melissa Booth, Jake Michels and Michael Ninivaggi of Vendor have been contacted by multiple Client representatives (Dan Applegate, Scott Martin, with sometime differing instructions as to where Client would like aircraft to be located for purposes of removing the Equipment.  For the sake of good order, and to permit the prompt removal of the Equipment, Vendor wishes to ensure that all parties are aware of and aligned on logistics matters.

As Melissa discussed with Scott Jensen, Vendor does not have sufficient hangar space in Daytona for all 26 Aircraft.  In order to facilitate removal by Client of the Equipment, Vendor has identified an additional facility with hangar capacity (likely Macon, Georgia) where the Aircraft can be made available to Vendor's team.  Given current weather projections and logistics, Vendor estimates that if Aircraft moves start today all Aircraft will be at these locations by Tuesday, June 12.  Some Aircraft are already in Daytona Beach, and others will arrive in Daytona Beach/Macon in advance of that date.

One issue we have had to handle, and which delayed our responses to you, is that some of the Aircraft would have very long trips eastward, which depending on weather and routing would be broken up and delayed by mandatory maintenance requirements, resulting in their arrival after June 12. We have been able to get work done such that there are only three Aircraft (N61951, N469MB, and N5887Y) whose eastbound flight might be so affected, and even then only if weather forecasts change adversely.

As an alternative to consolidating the Aircraft at two locations, if Client prefers Vendor can also leave the Aircraft where they are presently located (as list

DM_US 152817563-2.103541.0011

June 8, 2018
Page 2 of 3

attached as <u>Exhibit A</u>, which reflects the information in the current daily report delivered to you in the usual manner) and Client can remove the Equipment at such locations.

**Please let us know, by circling as appropriate on the signature page below, whether Client (a) wishes us to relocate all Aircraft to Daytona/Macon, or (b) will remove the Equipment at the present location(s) of the Aircraft.**

**To the extent you would like specific Aircraft delivered to specific locations other than Daytona/Macon, for example the Aircraft on which LIDAR Equipment is installed, please so indicate by marking <u>Exhibit A</u>.**

**Once Vendor receives Client's response it can instruct pilots appropriately and finalize the arrangements for hangar space in Macon if needed.**

We are sure that Client will understand that, given Vendor's space and operational constraints, once any Equipment or component thereof is removed from an aircraft it must be promptly removed from the premises, and in any event no later than by the close of business on the day of removal from the Aircraft. Similarly, please ensure that Vendor's work teams bring all necessary tools and packing materials.

### *Outstanding Invoices*

For the sake of good order, please note that: (i) invoice No. 555817 in the amount of 324,000 is due by June 20, 2018, and (ii) invoice No. 555818 in the amount of $385,525.11 is due by June 30, 2018. (These invoices cover amounts under both the Agreement and LIDAR Agreement (defined below)). Invoices for the month of June will be delivered to you in accordance with the Contracts.

### *LIDAR Agreement*

We note that the Client and Vendor are also party to an Air Services Agreement related to Aircraft on which LIDAR equipment is installed (the "***LIDAR Agreement***" and, collectively with the Agreement, the "***Contracts***").

Client has confirmed via email that it instructed the LIDAR Aircraft to stand down and cease all operations on behalf of Client, with certain small, very limited exceptions, as of June 4, 2018, notwithstanding that under the LIDAR Agreement the "Operating Period" for LIDAR Aircraft runs until June 15, 2018.

### *Termination/Non-Renewal of Contracts*

Vendor hereby notifies Client that, in accordance with Section 3 of the Agreement and the LIDAR Agreement, Vendor is terminating the Agreement and the LIDAR Agreement at and as of the end of their respective current Renewal Terms. Accordingly, as of September 15, 2018, neither Contract shall be of any further force or effect, save for the portions thereof which by their express terms survive termination. Until such date each Contract shall remain in full force and effect, unaltered.

DM_US 152817563-2.103541.0011

June 8, 2018
Page 3 of 3

Vendor will continue to comply fully and in all respects with its obligations under the Contracts and expects the same of Client.

It has been our pleasure to partner with Pictometry over the last 13 years, but the economics and operational terms of the present Agreement are simply not viable for us. If you would like to resume discussions regarding a new Air Services Agreement along the lines we proposed at our most recent meeting in Daytona Beach, we would be prepared to do so.

Sincerely,

Air America Flight Center, LLC

PICTOMETRY INTERNATIONAL CORP.    (a)  Deliver Aircraft to Daytona, Florida and Macon, Georgia.

By: _____
Name: _____
Title: _____    (b)  Leave Aircraft where presently located.

<u>Exhibit A</u>
Aircraft Locations

| **Aircraft** | **Current Location** | **Special Instructions** |
|---|---|---|
| N469MB | Vancouver, BC (CYVR) | |
| N53151 | Spokane, WA (KGEG) | |
| N61951 | Vancouver, BC (CZBB) | |
| N21692 | Edmonton, AB (CYEG) | |
| N5459K | Sacramento, CA (KMCC) | |
| N64875 | Sacramento, CA (KMCC) | |
| N121CW | Tulsa, OK (KTUL) | |
| N18MW | Vancouver, BC (CYVR) | |
| N63886 | Tampa, FL (KVDF) | |
| N105CH | Lawrence, KS (KLWC) | |
| N370MD | Denver, CO (KBJC) | |
| N5887Y | Denver, CO (KBJC) | |
| N62756 | Sacramento, CA (KMCC) | |
| N5977Y | Salt Lake City, UT (KSLC) | |
| N54757 | Moab, UT (KCNY) | |
| N13980 | Provo, UT (KPVU) | |
| N6943Y | Cedar City, UT (KCDC) | |
| N63940 | Hartford, CT (KBDL) | |
| N229DS | Philadelphia, PA (KPNE) | |
| N5038Y | Daytona Beach, FL (KDAB) | |
| N89721 | Daytona Beach, FL (KDAB) | |
| N9240H | Daytona Beach, FL (KDAB) | |
| N5280R | Daytona Beach, FL (KDAB) | |
| N925MH | Daytona Beach, FL (KDAB) | |
| N5157Z | Daytona Beach, FL (KDAB) | |
| N9850V | Daytona Beach, FL (KDAB) | |